Charles DeLario for Appellant Sananikone. If it were Hawaiian, I could do it, you know, but. It's sort of Hawaiian. He lives in Hawaii, Your Honor. And that really is the nub of the problem, if you will. The question before the Court is whether Mr. Sananikone was a responsible person within the meaning of the Revenue Code or whether he was, as we contend and as I believe the evidence compels, a responsible outside director. No Ninth Circuit opinion, nor for that matter for any of the other circuits that I or the government could find, has ever held that an outside director who was neither an officer nor a majority shareholder nor indeed had the power to do more than elect a single person on a five-member board to be a responsible person within the meaning of the statute directing the payment of trust fund taxes, payroll taxes. But our problem here is that we're looking at a jury verdict. A jury verdict isn't easy to overcome. And it certainly can't be the case that because you have this title, you could not be responsible. The question really is, is that title by itself enough? And the answer is clearly no. There are no cases saying it's enough, and it doesn't logically flow that it's enough. But that doesn't end the case. There's evidence presented to the jury as to your client's role. Your client may have been right, but the jury decided otherwise. And at this point, what we're doing is reviewing a jury verdict. Roberts. No, I appreciate that. And that's always a tall, tall mountain for the appellant to climb in this Court or any Court, any appellate Court. But I submit to you that the evidence is insufficient as a matter of law to support the conclusion that the jury made. And the jury was assisted by the failure of the trial judge, the district judge, to honor Sananacone's request that there be a special verdict. Because as they were instructed and as the verdict read, they could have found him liable merely because of his status as a director. Well, it was a fact that they could consider. Judge Black? I have a little problem with this argument because, as I understand it, counsel stipulated to the jury instruction. Is that correct? It's not the instruction so much the problem, Your Honor, is it's the instruction in combination with the special verdict. And the special verdict was that the jury instruction that was given. They did. We do not contest the jury instruction as being a misstatement of the law. I don't believe we didn't make that contention in our belief. And the jury instruction encompasses many of the questions that the interrogatories went to. Is that correct? It does. The critical instruction was the instruction where the district judge told the jury that there were these list of factors that they were to consider that were not exclusive. And that was the problem because they were not exclusive. And let me ask you one more question. And I've looked at the questions. I've looked at the jury instruction. And I've read the closing argument. And in the closing argument, counsel made argument based on the jury instructions as to how the jury should view the evidence. And in that argument addressed many of the issues that were encompassed in the special interrogatories that were proposed. Is that right? That's right, Your Honor. But the argument, the mere, obviously the jury rejected the argument because we wouldn't be here, at least I wouldn't be on this side of the table if the jury had accepted those arguments. And the problem is compounded by the fact that we have a – the law instructs us to engage in a quarter-by-quarter analysis. And when you do that, the government's case and the conclusion of the district judge in her memo denying the motion for a new trial aggregates all the evidence. And as you may have noticed in my reply brief, I gave you a table where I listed on one axis all the factors. I listed on the other axis the various quarters in question. And what we come up with is a very skinny record as to most all of those quarters. The evidence showed Sinanacone's involvement most heavily in the quarters when the taxes were paid, fourth quarter, 99, first quarter, 2000, and first quarter, 2001. There's no – those taxes were paid. There was some critical evidence here that I think, because we have this problem with the – we don't know what the jury did. The jury could have found properly. The jury might not have found properly. But if the jury found Sinanacone liable merely because he was a director, that was one of the factors, he was a shareholder, but that wouldn't be enough on this record. He was a – Let me ask you a question on this particular thing. It strikes me that very often our standard of review is going to be very important as to how an issue comes out. And what is the standard that we review the failure to give a special instruction? Regrettably for me, Your Honor, it's abuse of discretion. So could you argue for me – yes, that's what I thought, too. So could you argue for me why this was an abuse of discretion, having in mind that the jury was properly instructed? I think we have to give the given. Both sides agree to that. Because the jury was properly instructed, how is this an abuse of discretion not to give something in addition? Because we can't tell whether the jury's verdict rests on a proper basis or an improper basis. That's the nub. Well, but the cases suggest that that's improper. That's the whole point of having a special verdict, so that we, coming after the trial, the court, the appellate counsel, don't have to guess at what the jury did. What's your – that's right. And that's probably a – well, I won't get into that. But what's your best case that this was an abuse of discretion? Given that the jury instructions were fine, there's no one complaining about the evidence, what's your best case that this was an abuse of discretion? Your Honor, there aren't any cases directly on this point in this context. And if there were, they'd have been in somebody's brief. I was looking. Ours are the government. So I have to concede that we're looking at general principles here as applied to a specific fact situation that doesn't come up very often. We haven't had most of the reported decisions, as I'm sure Your Honor knows, dealt with court trials and not jury trials. In fact, I don't remember a single one of those cases, at least not the circuit cases, that were the result of jury trials. Would I like to try this case myself and do it perhaps a little differently? Sure, I would. But I'm – we're all here with the record that's been dealt with, playing the hand that was dealt. And I accept that. But I submit to you that when we look at a quarter-by-quarter analysis, and we see that we examine, as we did, the record of what was – what Mr. Sananacone was doing during those periods, we see that the danger was that the jury and, in fact, the district judge did the same thing in denying the motion for a new trial, is she going to be able to use the evidence from all of the quarters, including the ones in which the taxes were paid, to come up with this macro – Well, it's not entirely illogical. I mean, unless there's evidence that his responsibilities changed dramatically over time, what I do one week is pretty much what I do another week. And the jury could fairly infer that was true for your client. I mean, the burden ultimately is going to be on him to show that it's not willful and that he's not in the loop. So if they decide, look, we got information that this employee is talking to him about this or this employee has testified that he knew about that during one period of time, it's not illogical for the jury to decide it was probably that way at other times, too. Well, but there was no evidence that there was a continuing degree of involvement throughout the period in question. Was there evidence there was a dramatically different degree of involvement? Yes, there was. And the jury may not have been persuaded by that. Well, this segues me or circles me right back to my point about the lack of an instruction or special verdict. Well, the special verdict, I've got to say, I've been curious as to what form that would take, because I've seen lots of verdict forms. I proposed a good number when I was still in practice, and I don't recall ever seeing one that says, okay, which of these various factors persuaded you to reach this – make this finding? I mean, that's – that would be an unusual form, I think. I believe that was essentially what was proposed. Yeah, but that – do you see it actually used very often? I mean, I've taken cases to the jury and I don't recall ever them being asked to specify which piece of evidence or which facts really weighed heavier in reaching – in causing them to reach their ultimate finding. But you could have a – you could have a simple list with regard to the quarter. Did he do this? Did he do that? Did he do this? Did he find that he did this? Because there was – the evidence was very different from quarter to quarter. In the – in 499, in 1-2000, the company was getting off the ground. He was recruited by Mr. Ta to come in and be the Asian front, the East – you know, the title of chairman was going to have some cachet with people they hoped to encourage to invest in the company. And he was given lots of shares of stock cheap. So – Oh, everybody paid the same thing, Your Honor. It was – But – and it's not like he's doing this solely as a charitable activity. It was – so he's taken on this responsibility. Well – The jury heard that. He took on some responsibility. He did not take on the responsibility, nor did he later assume the responsibility for determining whether or not the taxes were paid on any given quarter. You'll recall the testimony, uncontradicted, was if someone looked at the software, they wouldn't even know that the taxes had not been paid because they would show as paid, but they would simply, you know, circular file the checks. And what the evidence does show, uncontradictedly, is every time it came up, Sinanakone was saying we must pay the taxes first. He wasn't a dummy. He did – there was nothing in this for him. Maybe if the company hit a home run, the guys who were there on the line, they were collecting big salaries. Sinanakone got 500 bucks per meeting if he got that. And, you know, it – yes, I acknowledge the cases that say that there – it doesn't matter if there are people who are more culpable. If he met the definition, he, too, was liable. But there's a certain – there's a certain element of fairness here that I think has to be considered, and I think that that's why – But this isn't a slam-dunk case, and I haven't reviewed the evidence the way the jury did, but I've looked at a lot, and I wouldn't have been surprised if the verdict had come out differently. Your problem, as you've acknowledged, is that the standard of review is such that you've got to go more than that your client had a compelling case. It had to be a really compelling case, and the alternative wasn't viable. Well, I believe that we've met that standard. And I would particularly urge the Court to engage in the quarter-by-quarter analysis, as we've done, because it may well be that you would conclude, for example, that he was – had more involvement at the end, certainly the last quarter of 2001. He had a lot more knowledge of what was going on and more activity as it became clear that the company was losing money on every house that they sold. They built these – instead of two-by-fours and whatnot to frame houses, they were building steel frames, and the business model was flawed. They had – they were losing money every time that they built one of these things, and that was not apparent. There's no evidence to the contrary. Anybody knew that before about October 2001. So could you say, yes, the jury was right for 401? Yes, you could. But they wouldn't necessarily have been right for 400 or 200 or 200 when there wasn't even a single board meeting, when the key witnesses that testified against Sananacone, Ms. Amarentine and Mr. Yeager, weren't on the staff. They had no basis for testimony. There's no foundation, and objections were made to that evidence. There was no foundation for Amarentine to say she believed Sananacone had authority to direct the taxes were paid. Certainly not. Well, counsel, your argument that he didn't really have anything to do with the company in January, February, or March, I just quickly looked through the record to see the number of phone calls made. He made 54 in January, 71 in February, 35 in March. That doesn't seem like – the jury could have viewed that as having a lot to do with what was happening in the company. Yes, Your Honor, but you're looking at phone calls made in the first three months of January 2000 when the taxes were being paid, and there's no evidence of phone calls, and believe me, the government got all his phone bills from day one to day – He made phone calls every month. Some. I mean – But does making a phone call as an outside director make you a responsible person? He wasn't on the premises. Well, certainly not. Certainly not. And I understand that would be a jury argument. I was just asking you a question because you said he wasn't involved with the company, and I was suggesting the jury could have looked at these phone calls and said, well, yes, he was involved with the company. No. Perhaps I misspoke, Your Honor. I did not say he was not involved at any time throughout this period. That's clearly not correct, and I didn't mean to imply that. But I do submit to you that when you look at the evidence, the evidence that most favors the government here was evidence that was extracted from quarters in which the taxes were paid. And for that reason, that cannot be, in our opinion, sufficient substantial evidence to support a verdict for other quarters. I see I'm winding down to my last four minutes, so I'll reserve the balance unless you have any questions for me immediately. Thank you. Thank you, Judge. We'll move on. May it please the Court, good morning. My name is Teresa McLaughlin, and I represent the government. And unless the Court had another preference, the first thing I would like to address is why we don't believe it was an abuse of discretion for the Court to have rejected the taxpayers' proposed verdict form. The proposed verdict form first asked the ultimate question of responsibility, and then it asked for the jury's position on just certain aspects of that favored taxpayer, such as the holding of, you know, corporate management office or having checksigning authority. And it was as if to impeach any verdict the jury wanted to arrive at regarding, you know, taxpayers being, in fact, responsible. So the government, I think, legitimately pointed out that this proposed verdict form was too much like a checklist and that it might inhibit the jury and prevent them from arriving at a verdict of responsibility on the basis of all the evidence, you know, unless they felt they could check off these factors as yes, and that as a result it would lead to confusion of the jury. And I think the whole thrust of it was to take the ultimate question of fact of taxpayers' responsibility away from the jury. And as the district pointed out, and I heard my opponent concede, the request was not supported by case law. So regarding we think that the jury's verdicts were correct, both on the question of responsibility and on his willfulness, there were the record is replete with individual acts the taxpayer took that would support his finding, support the jury's finding of responsibility. He made hundreds of telephone calls, including faxes, to the corporate offices. He took multi-day trips. Sometimes he, once he billed the corporation for three days on one trip of his time, he billed the corporation for four days, excluding travel on another trip. Starting in May 2000, he had a consulting agreement with the corporation. It was done with, he signed it, but it was his corporation, PACMAR, that he worked for, to provide support to management in addition, in addition to his responsibilities as chairman, in return for a discounted fee of $500 a day, I guess his normal rate was higher, for, and it included for occasional managerial backup support. So there was, this contract acknowledges that there was an intent to have him exercise some, you know, executive authority. So also early on, February 1, 2000, he faxed the current president, McDonald, chastising him for disbursements that caused a failure to meet a payroll. And this was something that he did alone. Then in January 14, 2000, he told Reines, the other director who was not an officer, in an e-mail that he'd been on the phone with ASF executives, Ta, Paul Ta, President McDonald, Luong, et cetera, constantly trying to find ways to solve our financial problems. So that's, it's not just later in the corporation that he was exercising this responsibility. He signed a note on behalf of the corporation to McDonald that one of the important things the corporation did on starting out was to buy McDonald's equipment. And taxpayer signed the note for 59,000 to pay, a down payment had been made to McDonald's but this was a $59,000 note for the remainder of the purchase. And that was signed in February, 2000. What evidence tied him to the failure to pay the payroll taxes in particular, or knowledge as to the failure to pay the payroll taxes in particular? Okay. Well, the most, first of all, also very early on in his career, he was not a taxpayer, but early on, in the winter of 2000, Paul Ta pointed out to the board that advances had been made to Mr. Lay and Mr. Truong without withholding federal and state taxes. So that's not this huge problem, but this isn't, you know, the first instance of a problem. That's a different kind of problem, isn't it? That's a problem that they're making payments to these people where they're supposed to withhold some payroll taxes and they haven't done it. That seems to me just generically a different kind of problem than we've collected this money that's supposed to go to the government, only we're not giving it to the government, we're keeping it and using it for separate purposes. I'm not sure how the illustration you just gave speaks at all to the problem that we have here. Well, the case law says that when you make a pay, you know, a compensatory payment, liability attaches at the time it is paid. So there really should have been amounts withheld at this time. But I'll move on to the other. But that's a different screw-up. It's a screw-up, but it's a different kind of screw-up. Well, we think it's in character really the same kind of screw-up because those, some of those taxes, not the employer portion, but the employee income tax withholding, you know, paying net wages is, it's established it's a violation of Section 6672. So what they did was they paid net wages, and it was an isolated instance at that point, but arguably it put taxpayer on notice starting in the winter of 2000 that there would be a, that there, you know, that this had happened. And once something, once there is a screw-up. Wasn't it, maybe I misunderstood, it's McDonald and I've forgotten the other name. I'm lost in the cast of character. They paid money without withholding the payroll taxes, but that means they're overpaying those people. It's not, it's not the same problem as taking money that they've extracted from the wages of other employees for payroll taxes, but then not giving it to the government, using it for the company's own purposes because they are cash poor. That's what I'm interested in. What is there that, that, that links the appellant to the payments that should have been made to the government, but were retained by the company? Okay, well, in January 2001, there was a board meeting, and there was some disagreement, you know, about whether the tax problem, the problem with these withholding taxes was discussed. The current president, the president at that time, Mr. Infeld, insisted that he told the board at the January meeting. The minutes only mentioned taxes, generically, but he, he maintained that, you know, he had discussed the payroll tax liability for the three quarters of the, last three quarters of the preceding year. And then he also said he specifically discussed the issue with taxpayer by phone in January. Paul Ta, who was the executive vice president, told the whole board about it prior to the April 2001 meeting, he said. So now we're talking about things that, that are communicated at the January 01 meeting and the April 01 meeting. Right. And the, the January minutes do mention taxes, but not payroll taxes. Then Infeld said, well, I saw it wasn't in the minutes, but what was done was it was just put in the April minutes. And he insisted that he had told them in January. Then the bookkeeper, Ms. Amirante, sent taxpayer an e-mail about the problem in April 2001, and he denied discussion. He denied getting it because he, he said he wasn't using that e-mail address anymore, but it was an e-mail address that he had on his letterhead asking for expense reimbursements at about this time for his travel and telephone calls. And, but in any event, he admitted that he was expecting to get something about this problem from Mr. Infeld at about this time. So this time meaning April 2001? Yes, April 2001. And he admitted that he had heard the presentation that, you know, Ms., he didn't recognize her, he didn't remember that it was she, but he remembered a woman coming into the meeting and saying there is a problem. So what, what if anything is there about earlier knowledge? I mean, we've now talked about a board meeting in January 2001, a board meeting in April 2001, other communications in 2001. I understand that we're also talking about, was it the last three quarters of 2000? Is there any information with regard or any evidence with regard to his knowledge during those time periods? Well, yes. There was the, William Yeager was hired as a controller in July 2001, and while nobody else was present, you know, at the weekly session of what bills to pay, he and the bookkeeper made a single federal tax return. He made a tax deposit of $6,000 for the current tax liabilities, and he recalled that the next day, taxpayer called him and chewed him out for paying the taxes, and also told him that from then on, there would be somebody else, there would be other people at this, you know, bill-paying meeting to ensure that this wouldn't happen again. So that's in July 2001? Yes. And then part of Yeager's job was to go through the books and prepare a financial statement. So he did prepare a financial statement as of October 31, 2001, and an attachment was made to Yeager's book. And then in that attachment, well, in that financial report ---- What I'm noting here is that everything is about 2001, and I've now asked twice specifically about 2000. Oh, I'm sorry. And you're starting to talk about 2001 again. Oh, I thought you wanted to know, you know, about the last time. Earlier in time. I mean, knowledge is cumulative, so all sorts of evidence that might sustain a verdict with regard to 2001, but so far I'm still waiting to hear something about the year 2000. I think it's important to know that you are a responsible person for all quarters, even if at the time you find out about the liability, that the liability has been unpaid, if at the time you find out, even assuming that all of the trust fund taxes have been dissipated, you have a duty to apply all unencumbered funds that do come into the trust fund liability, and it's ---- funds are not encumbered unless they are only when the taxpayer is legally obligated to use them for a purpose other than to satisfy the trust fund liability, and that obligation is legally superior to the interest of the IRS in the funds. Like, if you sit there ---- Is your answer to your question, there isn't anything for 2000? There's no evidence dealing with 2000? Is that your answer? Well, other than the failure to withhold from the payments in January 2000 to the ---- withhold any employment taxes, including trust fund taxes, from those two payments to Tron and Lay, Tron and Lay. But it doesn't matter because once a response ---- once a person who is responsible for the earlier quarters is put on notice, even if the trust funds to that point were dissipated, he's under a duty to apply all of the money that comes into the corporation unless it is encumbered by a superior legal obligation to ---- You just told us that. Okay. So I take it the answer is that the government's theory is that he may not have had actual knowledge prior to January 2001. And he might have, but you haven't identified anything to us that supports the proposition he had actual knowledge prior to January 2001. But that, because of the knowledge that he acquired in 2001 at a time when the company had sufficient unencumbered funds, he was responsible for paying a large amount of money. And would be deemed a responsible person for the earlier quarters. Is that the government's theory? Well, he would be deemed willful, that he already is responsible and he is deemed willful. But there is ---- Well, let's say I'm a little confused here. What makes him responsible for something he's not knowledgeable about? A willfulness is a different question. But responsibility, we've gone through this. There's a whole litany of things you look at at a time whether somebody is a responsible person. And my sense was it would include knowledge about the financial situation. Okay. Well, the government's position is that the failure to withhold from the advances made to the two employees in January 2000, which included trust fund taxes, put taxpayer on notice that, you know, once there is one problem, there might be another problem. Then there's actual knowledge from many witnesses starting in January 2001. He himself concedes, conceded that he knew by April 2001. And in 2001, the corporation had received over $3 million in revenue. Counsel, I have a record question. I thought Tal wrote in February 2000 a letter to him complaining that no taxes had been withheld from certain employees' salary advances that were made in January. Now, and so Tal wrote, I thought Tal, there's a letter that Tal wrote about that. Now, the taxes were subsequently paid, but I thought there was a letter in evidence. Am I wrong? No, you are correct, Your Honor. And that is the knowledge, the incident of which taxpayer was made aware by Paul Tal that was the same kind of failure as this, as the failure that recurred starting in the second quarter of 2000. And once there is a problem, and you're placed on notice that there has been a problem, then you might be in reckless disregard of the fact that there has been a problem. You might be in reckless disregard of a known or obvious risk. That problem is... And that is part of the willfulness inquiry. Did the payment to those employees without the payroll taxes being withheld benefit the company in some fashion? I mean, it looks to me like a screw-up, but not something the government, the company could profit on. Well, you know what, there is an obligation to withhold, and to withhold the trust fund taxes from the wages of the employees. The liability for the trust fund taxes attaches at the time net wages are paid without withholding these taxes. What was the question I posed to you? I'm sorry, Your Honor, I lost track of it. Because it didn't appear to be answering it. Let me try that again. Did the company benefit in some fashion by not withholding the payroll taxes? Not this time, because... Fine. And that's why it strikes me as a different kind of problem. A problem, but not one where he has reason to think, oh, gee, they're playing fast and loose in the accounting office because they don't have enough money. They paid out the money they're supposed to pay out. The problem is they didn't pay the part to Washington that should have gone to Washington. That's a different problem to me. It's relevant to someone, a responsible person's knowledge of a problem with paying over the taxes, and there was one very early on. Counsel, isn't this also relevant to what a member of a board should be doing? A member of the board should be asking questions about, as happens throughout this whole case, well, I want to see an audit, I want to see what is being done, I want to make sure the company is making money. Are you suggesting that a jury could view this in a different, and by this I mean February 2000, in a different way than I've just described? Isn't this just a regular board function? Well, I think it only, if you weren't responsible, it wouldn't matter. But if a person is responsible, you want to know it's relevant whether they are on notice of a problem with the corporation's administration of tax withholding. So, and finally, both the bookkeeper and the controller testified that they believed that taxpayer could have affected payment of the taxes. So unless the Court has any other questions. Apparently not. Thank you. Thank you. Thank you, Your Honor. Your Honor, we didn't talk about willfulness, which is the other element, but my opponent did touch on it and your questions to her also touched on that. In order to be willful, you have to be more than merely negligent. But there was no showing, even the, I would submit, the letter that's been under discussion here in early 2000, I think Your Honor has correctly pointed out that that is a problem of a different color than this problem. It does not even, it's not clear, and the record certainly doesn't reflect, that the penalty was assessed for those taxes. Let me, we have limited time, let me ask you to go to the government's legal argument with regard to liability possibly for earlier periods once a responsible person comes into knowledge that taxes from prior periods haven't been paid and that the company has unencumbered funds. So let's assume for the moment, hypothetically perhaps, that he did not have knowledge of the failure to pay over to the government the trust funds prior to January 2001, but that he or some other responsible person came into that knowledge at that time. Why wouldn't that person be liable for the preceding periods, because at that time he could have done something to make sure the prior periods were paid? Well, if that were, in theory that's correct, Your Honor. It's my understanding of the law that if there are unencumbered funds and the person was a responsible person looking backwards at the time that they became knowledge, a point which this would hypothetically. And you made a lot about how his knowledge and his involvement varied over time, and there were times when there's more evidence than not. But there are times when there was evidence, perhaps disputed, but there was evidence of his involvement and evidence of his knowledge. Why doesn't that end it? Because there's no evidence that there were unencumbered funds to pay the prior taxes. That's what's wrong with that argument. The stipulation which appears to be. I was going to ask about the stipulation. Go ahead. The stipulation which appears at page 56 of the excerpts was merely that there were on a quarter-by-quarter basis sufficient funds, unencumbered funds to pay the taxes as they came due. There was no stipulation that there was funds in July of 2001 to pay taxes from any prior period. There may or may not have been revenues in excess of those amounts during that period, but it was not demonstrated that they were unencumbered or that they were not, that they were preferring certain creditors over the government as has been suggested. That's what's wrong with that argument, Your Honor. Well, it requires some parsing of the stipulation, because I confess when I looked at it, I read it more broadly. That is, had enough money to pay all the trust fund taxes and had that money during each of the quarters. You're suggesting it should be read in a different way, that had enough money to pay the taxes for that quarter, but not necessarily for preceding periods? That's right. And I think that's consistent with all the evidence about how the company, what was going on with the company. This was not a company that was awash in money. This was a company that was losing money on every single transaction, and because they had such lousy financial reporting, nobody knew about it until very nearly the end in October when Mr. Yeager finally produced the documents. That, to me, and I think Your Honor has seized on it, I disagree that he was a responsible the Sananacone was a responsible person through any of these quarters. But I could understand perhaps finding it for the fourth quarter, perhaps the third of O2, but there is simply nothing to tack him. And when you question the government pointedly, she could, counsel could come up with no evidence in there because there isn't any. That sole letter from February of 2000 cannot support a reasonable inference that extends through the entire year, particularly when Mr. Sananacone was less involved. The true, as has been pointed out, he made a lot of phone calls early on in 2000, but by the time, but if you look at those records, he practically called none at all. And as we pointed out, this is what directors do. They check in from time to time. I think that the record does not support the verdict, at minimum, it does not support the verdict for the first three, for those last three quarters in the year 2000. Thank you very much. Roberts. Thank you. We thank both counsel for your helpful arguments in a complicated case. The case is submitted for decision.
judges: Black, Wallace, Clifton